## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIONA NICHOLS,

*Plaintiff,*

v.

JOSEPH OSEI, et al.,

*Defendants.*

CIVIL ACTION
NO. 22-4613

**PAPPERT, J.**                                                    **August 29, 2023**

### MEMORANDUM

Diona Nichols sued Correctional Sergeant Joseph Osei and the City of Philadelphia alleging Sergeant Osei sexually assaulted her multiple times during her incarceration within the Philadelphia Department of Prisons.  In her Amended Complaint, Nichols claims Eighth and Fourteenth Amendment violations against both defendants, battery and intentional infliction of emotional distress against Sergeant Osei, and negligence against the City of Philadelphia. The City moved to dismiss Nichols's claims against it, and the Court denies the motion in part and grants it in part.

I

Diona Nichols was incarcerated in facilities run by the Philadelphia Department of Prisons from February 2018 to October 2021.  (Am. Compl. ¶ 4, ECF 14.)  In August 2020, the City transferred all female inmates out of Riverside Correctional Facility ("RCF") and into either Mod-III or the Alternative & Special Detention – Central Unit ("ASDCU").  (*Id*. at ¶¶ 8-12.)  Until this transfer, Mod-III and ASDCU were used for limited housing purposes and neither was equipped with a video surveillance system.

1

(*Id*. at ¶¶ 11–12.)  Nichols alleges that "high-ranking PDP officials," including Commissioner Carney, approved the August 2020 reorganization and transfers and that this decision was made despite a "widely recognized" reduction in officer misconduct when cameras are used.  (*Id*. at ¶¶ 13–15.)

Once transferred from RCF to Mod-III, Nichols was a block worker responsible for certain tasks outside of her housing unit including, among others, cleaning the Sergeant's office and bathroom.  (*Id*. at ¶¶ 8, 17–19.)  Nichols alleges that, on three separate occasions, Sergeant Osei made forceful sexual advances, threatened her employment upon resistance, and sexually assaulted her.  (*Id*. at ¶¶ 20–41.)  Despite fearing Sergeant Osei and potential retaliation for coming forward, Nichols eventually reported the assaults to another officer.  (*Id*. at ¶¶ 42–47.)

The Amended Complaint cites a Bureau of Justice Statistics Report finding a 14% increase in sexual victimization allegations between 2015 and 2018.  (*Id*. at ¶ 51.) Nichols claims specifically that sexual assault accusations within the PDP rose from 9 to 69 between 2018 and 2021 and that Commissioner Carney was "undoubtedly aware" of this change but failed to "implement necessary corrective action."  (*Id*. at ¶¶ 58–59.) She also alleges that the PDP failed to meet the standards established by the Prison Rape Elimination Act ("PREA") and were on notice of similar behavior by other guards: that a PDP officer was transferred to a men's facility after taking pictures of women sleeping in the Mod-III facility, other officers were known to have sexual relationships with inmates, and various staff members knew about ongoing inappropriate sexual contact with inmates.  (*Id*. ¶¶ 55–87.)

II

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

III

The City argues that Nichols has failed to properly state a *Monell* claim; specifically that she does not allege a policy or custom, conduct by a policymaker, or, for her failure-to-train and supervise claims, prior instances of misconduct. (Mot. 5–11, ECF 14.)

A

1

A municipality is not subject to *respondeat superior* liability under § 1983 and instead must itself cause the alleged constitutional violation. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). But it is considered a "person" within the meaning of that statute who can be sued when an employee's "execution" of an "official policy" or custom "inflicts" a constitutional injury. *See Monell*, 436 U.S. at 690, 694.

A municipal policy is an official proclamation, policy or edict issued by a municipal employee with "final authority" over policymaking. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). A municipal custom, by contrast, is "a given course of conduct, although not endorsed or authorized by law, [that] is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850. (3d Cir. 1990)). Pointing to an unconstitutional policy or custom is not enough, though. "A plaintiff must also allege that the policy or custom was the 'proximate cause' of [the] injuries." *Id.* (citing *Kneipp v. Tedder,* 95 F.3d 1199, 1213 (3d Cir. 1996)).

2

Nichols argues there is a widespread custom of sexual misconduct among guards at PDP. (Resp. Brief 5, ECF 16.) She claims that PDP had seen an increase in inmates' sexual assault allegations against staff in recent years, including the 60 separate assaults that occurred in 2021, and that Commissioner Carney and other senior officials at PDP were aware of this alleged trend and disciplined offending officers. (Am

4

Compl. ¶¶ 55–62.)  A plaintiff "need not demonstrate that their injuries were the direct result of formal departmental procedures" to establish the nexus requirement, but rather that "policymakers were aware of similar unlawful conduct in the past," failed to "take precautions against future violations," and this failure, "at least in part, led to their injury." *Bielevicz*, 915 F.2d at 851.  While it is up to the jury to determine whether the City's alleged inaction actually contributed to the "conduct at issue" here, Nichols has, at least for now, adequately alleged the existence of a custom the City was aware of, did not try to remedy, and that, at least in part, contributed to her injury.  *See Estate of Roman*, 914 F.3d at 798–799 (holding that an amended complaint alleging a "continued official tolerance of repeated misconduct" using experiences, reports and statistics sufficiently demonstrated an unconstitutional custom and that a plaintiff need not identify a responsible decisionmaker at the pleading stage).

3

Nichols also contends that PDP's decision to transfer inmates from RCF, which had video surveillance, to Mod-III and ASDCU, which did not, is a policy decision giving rise to municipal liability.  (Resp. Brief 11–12.)  The PREA emphasizes the role video surveillance plays in deterring sexual assault in prisons, particularly in light of staffing shortages.  *See* 28 C.F.R. 115.13(a)–(c).  Nichols alleges that Commissioner Carney and senior PDP officials decided to transfer inmates to facilities without surveillance systems, notwithstanding staffing shortages, and that this decision "allowed" Sergeant Osei to abuse Ms. Nichols without detection.  (Am. Compl. ¶¶ 13, 79.)  Viewed in a light most favorable to Nichols, PDP's decision to transfer inmates to a facility without video

surveillance despite staffing shortages establishes at this stage a policy decision that proximately caused her injuries. *Estate of Roman*, 914 F.3d at 798.

B

1

Municipalities can face § 1983 liability for constitutional violations arising from a failure to train or supervise employees if that failure constitutes "deliberate indifference" to people's rights. *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019); *Harris,* 489 U.S. at 387–89; *see also Bd. of Cnty. Commr's of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence" of his action); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (municipal liability under § 1983 attaches only when a policymaker makes a "deliberate choice to follow a course of action" from "various alternatives").[1]

Deliberate indifference exists where (1) "municipal policymakers know that employees will confront a particular situation," (2) the situation "involves a difficult choice or a history of employees mishandling" and (3) the wrong choice will "frequently cause deprivation of constitutional rights." *Estate of Roman*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011)). Under this theory the plaintiff need not demonstrate an unconstitutional policy or custom because

---

[1]    A policymaker has "final, unreviewable discretion to make a decision or take an action," and those decisions or actions "constrain the discretion of subordinates." *Watosn v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990) (superseded in part by statute on other grounds)); *Kniepp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

the policy-or-custom and failure-or-inadequacy theories of liability are "distinct." *Forrest*, 930 F.3d at 105–06.

A plaintiff asserting a failure-to-train or supervise theory instead must ordinarily identify a "pattern of similar constitutional violations by untrained employees" that "puts municipal decisionmakers on notice that a new program is necessary." *Johnson v. City of Phila.*, 975 F.3d 394, 403 (3d Cir. 2020) (internal quotations omitted). The shortcomings must be "closely related" to and have "actually caused" the alleged constitutional violation. *Harris,* 489 U.S. at 390–91 (failure to train claims must show the "adequacy of the training program in relation to the tasks" the employee performs); *see also Brown*, 520 U.S. at 409–10 (a "high degree of predictability" can support finding of causation).

2

Nichols argues that her failure to train and supervise claims are "based on a failure of PDP to implement adequate staffing, surveillance, and supervision to such [extent] that sexual misconduct by PDP officers would be prevented or discovered." (Resp. Brief 9.) The amended complaint adequately alleges that PDP was aware of the increasing number of sexual assault claims alleged against their employees; that employees have historically mishandled the situation when confronted with it, given the disciplinary actions PDP allegedly took against guards; and that the wrong choice will result in the violation of inmates' constitutional rights. (Am Compl. ¶¶ 55–63.) This, paired with PDP's alleged failure to properly implement the PREA with respect to staffing and video surveillance systems could rise to deliberate indifference.

While a pattern is not necessary for a finding of deliberate indifference, considering the facts in a light most favorable to Nichols, the alleged examples of sexual abuse and harassment at PDP by correctional officers establishes a "pattern of similar violations by untrained" or unsupervised employees and the alleged disciplinary measures indicate that municipal decisionmakers were "on notice that a new program was necessary. . . ." *See Johnson*, 975 F.3d at 403 (noting that while a pattern is "ordinarily" required to establish deliberate indifference, plaintiffs may "otherwise" show that a failure to train would "likely" result in the violation of constitutional rights) (quoting *Harris*, 489 U.S. 378, 390). Although municipalities can initially assume that their employees will not engage in misconduct, "where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999). Because Nichols has pleaded multiple known instances of assault by PDP corrections officers, she has at minimum established a plausible basis for PDP's constructive knowledge of the risk. *See Brown*, 520 U.S. at 412. These allegations amount to a "plausible nexus" or "affirmative link" between the inadequacies in PDP's training and supervision and the assaults against her. *See Bielevicz*, 915 F.2d at 850.

IV

A

Under Pennsylvania's Political Subdivisions Tort Claims Act, local agencies are not liable for negligence unless the conduct falls under one of nine narrow exceptions. 42 Pa. C.S. §§ 8542(b). Nichols argues that the City is liable under the third exception, claims that pertain to the "care, custody or control of real property" because it failed to

"adequately equip Mod-III with surveillance cameras." (Resp. Brief 12–14); 42 Pa. C.S. § 8542(b)(3); (Am. Compl. ¶ 107).

The real property exception applies when the alleged defect giving rise to the claim was related to an "intended use [of the property that] was a specific, readily identifiable, distinguishable use." *Bradley v. Franklin County Prison*, 674 A.2d 363, 366 (Pa. Commw. Ct. 1996). The alleged defect must be a flaw of the property itself such that it renders the property "unsafe for its intended purpose . . . ." *Thornton v. Philadelphia Housing Authority*, 4 A.3d 1143, 1151 (Pa. Commw. Ct. 2010).

Other courts in this District have narrowly construed the exception, declining to extend it to circumstances under which the physical condition of the land or building did not itself cause the injury. *See, e.g.*, *Hagwood v. City of Philadelphia*, 604 F. Supp. 3d 293, 300–301 (E.D. Pa. 2022) (holding than an alleged defect allowing a third party to injure plaintiff did not fall under the scope of the real property exception); *Bowers v. City of Philadelphia*, No. 06-3229, 2008 WL 5210256, at *7 (E.D. Pa. Dec. 12, 2008) (finding that negligence claims arising out of prison overcrowding did not trigger the real property exception because plaintiff did not allege the building itself was unsafe for its regular use; collecting cases); *Hopson v. Cheltenham Twp.*, No 90-0587, 1990 WL 102883, at *11 (E.D. Pa. July 17, 1990) (holding that the real property exception does not apply to defective security cameras; it only applies when the condition of the property itself causes, not merely facilitates, an injury).

B

Nichols's incarceration in the Mod-III facility was an intended use of the property; as alleged, it is a prison intended to house inmates. The alleged defect,

9

however, is not clearly a flaw of the property that renders it "unsafe for its intended purpose." *Thornton*, 4 A.3d at 1151.  The presence or absence of security cameras does not alter the "physical condition" of the prison.

The cases Nichols cites in support of her argument are distinguishable.  Unlike padded safety mats on a concrete wall, non-slip floors in a shower, or even poor upkeep leading to a rat infestation, the presence (or absence) of a surveillance system does not alter the physical condition of PDP's real property.  *See* (Resp. Brief 13) (citing *Brewington v. City of Philadelphia*, 199 A.3d 348, 350 (Pa. 2018); *Bradley*, 674 A.2d at 366; and *Thompson v. City of Philadelphia*, No. 20-3134, 2021 WL 2156397, at *5 (E.D. Pa. May 27, 2021)).  While at least one court in this District recently contemplated surveillance cameras in the context of the real property exception, its analysis centered around whether preexisting cameras were themselves considered "real property" such that their inoperability was a negligent defect, not whether the absence of a system rendered a larger property defective.  *See B.D. v. Downingtown Area Sch. Dist.*, No. 15-6375, 2016 WL 3405460, at * 9 (3d Cir. June 21, 2016) (declining to resolve the question, finding it implausible that the alleged injuries were causally related to malfunctioning cameras).  It would be futile for Nichols to attempt to amend her claim under the PSTCA.  *See Harris v. Steadman*, 160 F. Supp. 3d 814, 817 (E.D. Pa. 2016) (citing *Anderson v. City of Philadelphia*, 65 F. App'x 800, 801 (3d Cir. 2003)).

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.